# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

DEANNA T.,                                    Case No. 20-cv-576 (ECW)

      Plaintiff,

v.                                            **ORDER**

KILOLO KIJAKAZI, Acting
Commissioner of Social Security,[1]

      Defendant.

---

This matter is before the Court on Plaintiff DeAnna T.'s ("Plaintiff") Motion for Summary Judgment (Dkt. 21) and Defendant's Motion for Summary Judgment (Dkt. 28). Plaintiff filed this case seeking judicial review of a final decision by Defendant denying her application for disability insurance benefits.

## I.      BACKGROUND

On September 21, 2016, Plaintiff filed an application for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act alleging disability as of July 29, 2016 due to nerve damage in her hands and feet, fetal alcohol syndrome, and a learning condition.[2]  (R. 307, 314, 336.)  Her application

---

[1]      Kilolo Kijakazi has succeeded Andrew Saul as Acting Commissioner of the Social Security Administration and is therefore substituted as the named defendant.  *See* Fed. R. Civ. P. 25(d).

[2]      The Social Security Administrative Record ("R.") is available at Docket Entry 16.

was denied initially and on reconsideration.  Plaintiff filed a written request for a hearing, and on November 20, 2018, Plaintiff appeared and testified at a hearing before Administrative Law Judge Micah Pharris ("the ALJ").  (R. 11.)

The ALJ issued an unfavorable decision on January 18, 2019, finding that Plaintiff was not disabled.  (R. 11-27.)

Following the five-step sequential evaluation process under 20 C.F.R. § 404.1520(a) and § 416.920(a),[3] the ALJ first determined at step one that Plaintiff had not engaged in substantial gainful activity during the period from the alleged onset date of July 29, 2016.  (R. 13.)

At step two, the ALJ determined that Plaintiff had the following severe impairments: intellectual functioning disorder versus mild intellectual disability more likely related to history of fetal alcohol syndrome than to Sjogren's; mood disorder; and Sjogren's syndrome with related peripheral neuropathy.  (R. 14.)  The ALJ also

---

[3]     The Eighth Circuit described this five-step process as follows:

The Commissioner of Social Security must evaluate: (1) whether the claimant is presently engaged in a substantial gainful activity; (2) whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations; (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

*Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007).

concluded that Plaintiff's anxiety was non-severe, "because it imposed no more than a minimal in [sic] the claimant's ability to perform work-related tasks."  (*Id.*)

At the third step, the ALJ determined that Plaintiff did not have an impairment that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. part 404, subpart P, appendix 1.  (*Id.*)

At step four, after reviewing the entire record, the ALJ concluded that Plaintiff had the following residual functional capacity ("RFC"):

> [T]o perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except the individual may never climb ropes, ladders, or scaffolds; and may occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl.  The individual may frequently handle, finger, and feel.  The individual may have no exposure to vibration, unprotected heights, or hazards.  And, finally, the individual would be limited to simple routine tasks at a nonproduction pace (i.e., no hourly quotas).

(R. 19.)

The ALJ concluded, based on the above RFC and the testimony of the vocational expert ("VE"), that given Plaintiff's age, education, work experience, and RFC, there were other jobs that exist in significant numbers in the national economy that she could perform, including work as an order clerk (DOT code 209.567-014, sedentary, unskilled, SVP 2); document preparer (DOT code 249.587-018, sedentary, unskilled, SVP 2); and dowel inspector (DOT code 669.687-014, sedentary, unskilled, SVP 2)).  (R. 26.)

Accordingly, the ALJ deemed Plaintiff not disabled.  (R. 26-27.)

Plaintiff requested review of the decision.  (R. 1.)  Plaintiff submitted various medical records, including records from her neurologist, psychiatrist, and physical therapist.  (R. 7, 41-126.)  Regarding these medical records, dated November 2, 2018

3

through January 16, 2019,[4] the Appeals Council stated, "[T]his evidence does not show a reasonable probability that it would change the outcome of the decision.  We did not exhibit this evidence." (R. 2.)  The Appeals Council accordingly denied further review on November 9, 2019, which made the ALJ's decision the final decision of the Commissioner. (R. 1-8.)  Plaintiff then commenced this action for judicial review.

The Court has reviewed the entire administrative record, giving particular attention to the facts and records cited by the parties.

## II.    RELEVANT RECORD

### A.    Medical Record

On July 29, 2016, the date of Plaintiff's alleged onset of disability, the emergency department admitted her in a wheelchair with complaints of numbness and tingling in her hands and feet as well as weakness in her extremities. (R. 426.)  She reported that these symptoms had been present for approximately a week, and she had never experienced them prior. (*Id.*)  This feeling was there constantly, seemed worse when she pushed on the affected areas, and was at its worst when she was standing all day at work (*i.e.*, when she worked concessions at Target Field). (R. 428.)  She denied any associated pain. (*Id.*)  Her neurological examination showed that she was alert, she showed normal strength, she had no cranial deficit, and her coordination and gait were normal. (R. 429.)  Her psychiatric examination was also normal. (*Id.*)  Plaintiff was discharged on the same day with a diagnosis of paresthesias/numbness. (R. 431.)

---

[4]    The supplemental records also included medical records for treatment after the ALJ's decision.

On August 1, 2016, Plaintiff returned to the emergency room with continued complaints of numbness, that her numbness and tingling were progressing up her wrists and ankles, and that she also had these symptoms around her mouth. (R. 439.) Plaintiff denied any weakness in her arms and legs but reported that her legs felt "like lead." (R. 439-40.) Plaintiff's neurological examination showed that she had normal strength, muscle tone, coordination, and gait, but was experiencing a decreased sensation to light touch in the hands and feet. (R. 441-42.) Plaintiff was discharged on the same day with a diagnosis of paresthesias. (R. 442.)

Plaintiff again presented herself to medical providers on August 2, 2016 with complaints of numbness and tingling in the extremities. (R. 452.) She reported that her symptoms had improved as to her tongue and feet, but tingling still went up to her shins. (*Id.*) The neurological examination showed no gross focal deficits, she had a normal gait and coordination, she had normal strength of all extremities, and she reported sensation to touch was present but noted tingling with touch to her feet, shins, and hands. (R. 453.)

Plaintiff continued to report numbness and tingling in her extremities, which at times included discomfort and burning pain, to medical providers in August 2016. (R. 465, 490-91, 503-04, 522.) Her neurological examinations were largely normal, including sensation to touch being present, but included reports of tingling with touch to her feet, shins, and hands. (R. 467, 470, 483, 485, 492, 494, 505.) Her psychiatric assessments were normal during this time. (R. 492, 494, 506.)

Plaintiff did report on August 16, 2016 that her paresthesias had been causing her significant discomfort in her feet and that had been keeping her from working her job as a

food vendor, which required her to be on her feet for more than eight hours per day. (R. 505, 507.) A neurological examination showed that her cranial nerves were grossly intact, her gait was tentative and slow secondary to discomfort, she showed no balance deficits, her sensation was normal bilaterally in her hands and feet, and the neuropathy in her hands and feet were worsened with palpitation. (R. 505-06, 508.) Plaintiff was started on amitriptyline to help with the pain and tingling in her hands and feet. (R. 509.)

On August 16, 2016, treating provider Ryan Jelinek, D.O., wrote a letter to Plaintiff's employer stating that she was not able to work for the next week due to her current medical condition, and that she should be reevaluated in a week. (R. 516.)

On August 22, 2016, Plaintiff saw neurologist Dr. Samuel Maiser, during which Plaintiff again noted uncomfortable tingling, numbness, and burning pain. (R. 538-39.) She had been "wobbly" and needed help with turning knobs and other maneuvers with her hands. (R. 539.) She reported no falls. (*Id.*) The prescribed amitriptyline that was supposed to help with numbness and tingling provided her some relief at night, but she still had a lot of symptoms during the day, and it caused side effects of dry mouth and grogginess. (*Id.*) Plaintiff reported that the numbness and tingling were predominately in her fingers on both hands, as well as the back of her hand. (R. 539-40.) She claimed she needed help turning knobs. (R. 539.) However, she reported normal sensation. (R. 540.) Plaintiff had normal strength in her upper and lower extremities, although there may have been a minor hint of weakness in the left. (R. 541.)

The secondary exam showed a reduced pinprick on her lower extremities to her knees and upper extremities to her wrist. (*Id.*) Dr. Maiser also confirmed Plaintiff's

Romberg (balance test) was wobbly, but she did not fall.  (*Id.*)  Plaintiff had normal and regular walking.  (*Id.*)  The impression for Plaintiff was length dependent peripheral neuropathy with an unknown etiology.  (R. 541-43.)  Dr. Maiser continued Plaintiff on amitriptyline for nerve pain and would work on also getting her a prescription for gabapentin for her nerve pain.  (R. 543, 546.)  Topical lidocaine was also planned for painful paresthesias.  (R. 546.)

Plaintiff underwent EMG testing on September 20, 2016.  (R. 577.)  The clinical results of the EMG stated it was "an abnormal study," with findings of sensory predominate neuropathy or ganglionopathy.  (R. 578.)  A definite diagnosis was not given, but the report stated "Sjogren's disease is likely etiology."  (*Id.*)  The report recommended clinical correlation.  (*Id.*)

On October 6, 2016, Plaintiff reported that she was "feeling okay" and that her symptoms were stable.  (R. 569.)  Plaintiff noted numbness and tingling remained in her hands and feet with no focal weakness.  (*Id.*)  She was able to walk a couple of blocks before needing a rest due to tiredness and weakness.  (*Id.*)  While the gabapentin helped a little, it made her tired.  (*Id.*)  Plaintiff also reported trying to obtain social security benefits.  (*Id.*)  Plaintiff's neurological and psychiatry examinations were normal.  (R. 570.)

On October 21, 2016, State Agency psychologist Mary Sullivan performed a psychiatric review technique for Plaintiff.  (R. 158.)  Dr. Sullivan found that no mental medically determinable impairment had been established.  (*Id.*)  Dr. Sullivan noted, "Clmt alleges she has a learning disability.  There is no evidence or indication in the

[Medical Evidence of Record] that clmt has any [Mental Health] impairments. Clmt was able to complete her [Activities of Daily Living] form. She has help [sic] employment in the past. No [Medically Determinable Impairments]." (*Id.*)

On October 20, 2016, State Agency physician Yacob Gawo, M.D., assessed Plaintiff's physical limitations and issued an RFC through July 28, 2017 (12 months after onset). Dr. Gawo found that Plaintiff could occasionally lift or carry 50 pounds and could frequently lift or carry 25 pounds. (R. 160.) In addition, he found that Plaintiff could sit or stand for six hours out of an eight-hour work day. (*Id.*) Plaintiff also had an unlimited ability to push and/or pull, including the operation of hand and/or foot controls. (*Id.*) Dr. Gawo made these findings relying on the peripheral neuropathy, which was predominately sensory with some gait and balance issues, including objective loss of light touch and perception. (*Id.*) In addition, Dr. Gawo opined that Plaintiff could frequently climb ramps and stairs; occasionally climb ladders and scaffolds; frequently balance; had an unlimited ability to stoop, kneel and crouch; and could frequently crawl. (R. 160-61.) Dr. Gawo further opined that Plaintiff was limited with respect to her gross and fine manipulation and limited as to her ability to feel in that she could only frequently engage in handling, fingering and feeling bilaterally. (R. 161.) Dr. Gawo based this opinion on the following: "Due to peripheral neuropathy of the hands and UEs which is predominantly sensory, handling, fingering and feeling with b/l hands/UEs is limited to frequently." (*Id.*) Dr. Gawo found no communicative limitations and no environmental limitations, except to avoid concentrated exposure to vibration and hazards (machinery and heights) due to her gait and loss of sensation. (R. 162.)

At an October 31, 2016 appointment, Plaintiff continued to complain of numbness in her hands and feet, which was mild to moderate, with no other accompanying signs or symptoms.  (R. 590.)  The objective examination of Plaintiff showed that she was alert with no distress, had normal strength and tone, her mentation was intact, and her speech was normal.  (R. 591.)

At a November 2, 2016 follow-up appointment, Plaintiff asserted that she was still having tingling and numbness in her hands and feet, with some difficulty with hand grip.  (R. 602.)  Her hands felt weak all the time, and she was overly fatigued and was experiencing occasional mild headaches.  (*Id.*)  Plaintiff's neurological examination showed that: Plaintiff's speech was clear, she followed commands, she was alert and oriented, she had somewhat slow responses, and she demonstrated hand grip equally bilaterally, 4-5/5.  (R. 603.)  While Plaintiff reported grip weakness, Dr. Stillman noted that this was difficult to discern upon examination.  (*Id.*)  Plaintiff reported to Dr. Stillman that she stopped working when she was diagnosed with "nerve damage," and asked Dr. Stillman to fill out a general assistance form.  (*Id.*)  Dr. Stillman opined that "Suspect that pt will indeed be able to work, but with her current symptoms in the context of likely cognitive deficits that seem to affect problem solving, completed form for 3 months of disability."  (*Id.*)  Dr. Stillman noted that "deficits in problem solving, ect. seem apparent by history."  (*Id.*)

On December 22, 2016, Plaintiff presented for a follow-up with respect to her neuropathy.  (R. 644.)  Plaintiff noted no difference with her numbness and tingling.  (*Id.*)  Plaintiff reported that she felt depressed the previous day and had taken out her anger on

her boyfriend and daughter, and that while she had days like that once and a while, she endorsed that it could be related to her menstrual cycle.  (*Id.*)  Plaintiff's neurological and psychiatric examination were normal.  (R. 645.)

On December 23, 2016, Plaintiff attended her follow-up neurology appointment with Dr. Maiser.  (R. 651.)  Plaintiff reported that she continued to have pain in her hands and feet that may have worsened.  (*Id.*)  Plaintiff continued to take gabapentin, which she tolerated well.  (*Id.*)  It was noted that Plaintiff had stopped taking an antidepressant. (*Id.*)  Plaintiff asserted that she had not noticed any worsening in her neuropathic symptoms, but that she was not sleeping well.  (*Id.*)  Plaintiff continued to not work and was pursuing disability.  (*Id.*)  She reported no falls but felt as though there was some heaviness in her limbs, and she felt like she had less strength.  (*Id.*)  The neurological examination of Plaintiff showed the following:

> Neurologic: Her speech is normal.  Her face is symmetric.  Her strength in her hands and her feet is normal including the intrinsic muscles of her hands and her feet.  Light touch provokes tingling paresthesias in her fingertips and throughout most of her feet but stops just above the ankle.  Her reflexes are normal except I was not able to get ankle jerks bilaterally.  Her Romberg, she sways but does not fall.  Her forward tandem she struggles moderately but otherwise h
> as a normal gait.

(R. 652.)  Dr. Maiser noted that Plaintiff's EMG was striking for neuropathy or more likely neuronopathy which is commonly seen in rheumatologic disorders such as Sjogren's, vitamin B6 deficiency or toxicity, or certain paraneoplastic panels especially seen in breast cancer.  (*Id.*)  Dr. Maiser suspected that Sjogren's was the cause.  (R. 652-53.)  Dr. Maiser also provided that "[f]ortunately her strength is normal, so her

neuropathy is sensory only at this point . . . ."  (R. 652.)  He also communicated to Plaintiff, "Fortunately, I don't think your muscles or strength nerves are involved, but your sensory (or feeling nerves) are involved and that is why you have pain."  (R. 653.)  Dr. Maiser increased her dosage of gabapentin for her neuropathic pain and agreed with a physical therapy referral.  (R. 652.)

On December 29, 2016, Plaintiff saw Robert Lopno, a licensed psychologist, for a psychological evaluation.  (R. 615.)  Plaintiff's educational history revealed that she obtained her high school diploma with special education programming in all core academic subjects.  (*Id.*)  Plaintiff's previous employment was as a seasonal employee at Target Field as cashier at a concession stand.  (*Id.*)  She averaged twenty hours per week. (*Id.*)  Plaintiff claimed to be able to groom, bathe, and dress with both instruction and direction from her family.  (R. 616.)  Her mother prepared all of her meals, which she could reheat in the microwave.  (*Id.*)  She was able to assist with preparing dinner.  (*Id.*) Based on the reporting of Plaintiff and her aunt, Dr. Lopno found her pace of daily activities was slow, and her persistence and concentration were poor.  (*Id.*)

In performing a mental status examination, Lopno found Plaintiff was alert and oriented to person, place, and time.  (*Id.*)  She was unclear as to the purpose of the examination.  (*Id.*)  Lopno also found that Plaintiff's "thinking was concrete, slowed, and goal directed.  Her affect was anxious, mood depressed, and demeanor cooperative and easily engaged."  (*Id.*)  Plaintiff was also administered the WAIS-IV, in which she earned a Verbal Comprehension Index score of 63, a perceptual Reasoning Index score of 67, a Working Memory Index score of 58, and a Processing Speed Index score of 62, yielding

a Full Scale IQ of 57, which is at a level equal to or greater than 0.2 of l00 adults her age and falling within the impaired range according to Wechsler on the WAIS-IV. (*Id.*) Plaintiff's memory scores were commensurate with her overall level of cognitive functioning. (R. 617.) The subtest scores were consistently within the impaired or near-impaired range on both measures. (*Id.*)

Lopno diagnosed Plaintiff with an intellectual functioning disorder (provisional), mood disorder due to medical condition versus depressive order, NOS, and cannabis abuse, sustained full remission. (*Id.*) Lopno further opined Plaintiff's prognoses were guarded without community and home supports, and opined as follows regarding Plaintiff's abilities:

> Based upon the above information and pertaining solely to her psychological status, this claimant was able to understand, remember, and follow only simplified instructions due to the effect of her cognitive disorder; sustain limited/fleeting attention and concentration; carry out work-like tasks with limited persistence and at a slow pace; respond appropriately to brief and superficial contact with co-workers and supervisors; and tolerate only meager stress and pressure typically found in an entry-level work place.

(*Id.*)

State Agency physician, Charles Grant, M.D., looked at Plaintiff's physical RFC on reconsideration on January 13, 2017. (R. 188.) Dr. Grant found that Plaintiff could occasionally lift or carry 20 pounds and could frequently lift or carry 10 pounds. (R. 185-86.) In addition, he found that Plaintiff could sit or stand for six hours out of eight-hour work day. (*Id.*) Plaintiff also had an unlimited ability to push and/or pull, including the operation of hand and/or foot controls. (R. 186.) Dr. Grant made these findings relying on the peripheral neuropathy, which was predominately sensory and some gait and

balance issues. (*Id.*) In addition, Dr. Grant opined that Plaintiff could frequently climb ramps and stairs; occasionally climb ladders and scaffolds; frequently balance; had an unlimited ability to stoop, kneel, and crouch; and could frequently crawl. (*Id.*) Dr. Grant also opined that Plaintiff was limited with respect to her gross and fine manipulation and limited as to her ability to feel. (R. 187.) Dr. Grant based this opinion on the following: "Due to peripheral neuropathy of the hands and UEs which is predominantly sensory, handling, fingering and feeling with b/l hands/UEs is limited to frequently." (*Id.*) Dr. Grant found no communicative limitations and no environmental limitations except to avoid concentrated exposure to vibration and hazards (machinery and heights), as the result of her gait and loss of sensation. (*Id.*)

On reconsideration, State Agency psychologist Kari Kennedy, Psy. D., found on January 18, 2017 that Plaintiff suffered from a medically determinable mental impairment that did not satisfy Listing 12.04-Depressive, Bipolar, and Related Disorders. (R. 183.) Dr. Kennedy concluded that Plaintiff was not significantly limited as to: her ability to remember locations and work-like procedures; and her ability to understand and remember very short and simple instructions. (R. 189.) Dr. Kennedy found Plaintiff was moderately limited as to her ability to understand and remember detailed instructions. (*Id.*) Further, Dr. Kennedy concluded that Plaintiff was not significantly limited as to her ability to: carry out very short and simple instructions; maintain attention and concentration for extended periods; perform activities within a schedule; maintain regular attendance, be punctual within customary tolerances; sustain an ordinary routine without special supervision; work in coordination with or in proximity to others without being

distracted by them; make simple work-related decisions; complete a normal workday and workweek without interruptions from psychologically based symptoms; and to perform at a consistent pace without an unreasonable number and length of rest periods. (R. 189-90.) Dr. Kennedy also opined as follows:

> The totality of evidence in file suggests that the claimant is able to: understand, carry out and remember simple instructions; able to make judgments commensurate with functions of unskilled work; able to respond appropriately to brief supervision and interactions with coworkers and work situations; able to deal with changes in a routine work setting. Clmt appears capable of unskilled work.

(R. 190.)

On February 13, 2017, Plaintiff saw certified nurse practitioner ("CNP") Corinna Werner at a rheumatology clinic. (R. 638.) CNP Werner noted the gabapentin had not been significantly beneficial to Plaintiff. (*Id.*) Plaintiff reported that she was unable to work due to pain and a decreased grip and sensation, and also because her cognitive function had slowed (short-term memory deficits) as well as her movements. (R. 638, 663.) CNP Werner observed that Plaintiff had an "abnormal grip" while using her cell phone, specifically she was "struggling to hold" it. (R. 666.) CNP Werner noted that the EMG from September 2016 was consistent with sensory predominant neuropathy, and she assessed Plaintiff with "Sjogren's disease with most prominent symptom of Neuropathy, cognitive deficits and SICCA." (*Id.*) Plaintiff was prescribed the antirheumatic prescription Plaquenil. (R. 667, 672.)

On March 2, 2017, Dr. Maiser filled out a checklist general medical source statement for Plaintiff's attorney. (R. 621.) The diagnosis for Plaintiff was Sjogren's

Disease with neuropathy.  (*Id.*)  Dr. Maiser opined that Plaintiff's symptoms would interfere with her ability to maintain persistence and pace necessary to engage in employment.  (*Id.*)  Dr. Maiser found that Plaintiff could frequently lift less than 10 pounds, occasionally lift 10 pounds, and never lift or carry 20-50 pounds.  (R. 622.)  He also found that Plaintiff could sit for six hours and stand for two hours.  (*Id.*)  Dr. Maiser noted that Plaintiff had no mental health diagnosis.  (*Id.*)  In addition, Dr. Maiser found that Plaintiff had a mild impairment as to maintaining social functioning and a moderate impairment as to her ability to maintain concentration, persistence, and pace.  (R. 623.)  The reasoning by Dr. Maiser for these limitations was the numbness and tingling in her hands and possible cognitive difficulties.  (*Id.*)

On March 8, 2017, an MRI of Plaintiff's brain was performed related to her memory change, diagnosis of Sjogren's, and paresthesias.  (R. 635.)  The results were normal.  (R. 363, 683.)

On March 16, 2017, Plaintiff attended a rheumatology follow-up appointment.  (R. 683.)  She continued to experience unspecified symptoms of cognitive deficits, paresthesia and neuropathy of fingers and feet, and stiffness and pain in her feet for about an hour.  (R. 683-84.)  The neurology examination showed a painful burning sensation to the touch of the top of her feet to the bottom of her toes.  (R. 687.)  The strength of her upper and lower extremities was within normal limits and her grip was rated at 5/5.  (*Id.*)  The rheumatology clinic prescribed a course of Rituxan infusions to help with her "debilitating neuropathy and cognitive changes."  (*Id.*)

On April 27, 2017, Plaintiff reported to Dr. Maiser that her neuropathic symptoms were about the same, and that they continued to be most painful in her toes, especially the right great toe, as well as her fingertips. (R. 700.) They also discussed her taking Rituxan, and Dr. Maiser explained the purpose of the Rituxan was to stop her "neuropathy from worsening and possibly even help it improve." (*Id.*) He prescribed lidocaine for focal areas of burning pain, which he had prescribed the prior year, but Plaintiff could not recall using it. (R. 701.) Dr. Maiser observed that Plaintiff had "some difficulty with history which does suggest some cognitive deficits . . . ." (*Id.*) Dr. Maiser did find that "[h]er neuropathy remains to be sensory predominant in that she has no weakness, and the sensory changes have not progressed since I have met her. This is certainly good news." (*Id.*)

On April 27, 2017, Dr. Kristin Venables performed a neuropsychological evaluation of Plaintiff. (R. 708.) Plaintiff attended the testing along with her mother. (*Id.*) Plaintiff's mother explained that she had drank excessively when she was pregnant with Plaintiff and was told when her daughter was born that she likely had fetal alcohol syndrome. (*Id.*) It was also reported that Plaintiff had a learning disability when she was young and received special education assistance through all her schooling. (*Id.*) Plaintiff asserted that she worked in concessions at Target Field and Target Center until she had to stop working due to physical symptoms in August 2016. (R. 709.) Plaintiff claimed that she also worked as a nursing assistant and at the airport in the past with duties involving assisting unaccompanied children and wheelchair transport. (*Id.*)

The behavioral observations by Dr. Venables included that Plaintiff was appropriately dressed and groomed; she was alert and fully oriented; her speech was fluent and the tone, rate, volume, and prosody of her speech were within normal limits; comprehension of speech and task instructions was intact; thought processes were logical and goal-directed; no abnormalities in fine or gross motor functioning were noted; mood was euthymic; and affect was appropriate to the situation. (*Id.*) Plaintiff did endorse severe symptoms of depression and moderate symptoms of anxiety on self-report screens of emotional functioning. (R. 710.)

Dr. Venables' testing showed that Plaintiff had intellectual functioning in the "extremely low range," with a full-scale IQ of 62. (R. 709.) Additionally, she found no significant difference between Plaintiff's borderline nonverbal intellectual abilities and her extremely low verbal intellectual abilities. (*Id.*) Plaintiff's auditory attention and working memory were also in the extremely low range. (*Id.*) Her processing speed was borderline. (*Id.*) Immediate verbal contextual memory was at the upper end of the low average range and delayed recall of this information was average. (*Id.*) Rote verbal learning was moderately impaired and delayed recall of this information was borderline. (*Id.*) Immediate memory for simple geometric designs was low average and delayed recall of the designs was average. (*Id.*) Visuospatial learning and memory were borderline. (*Id.*) Single word reading and math computation abilities were also borderline. (*Id.*) Fine motor speed was average with the right hand and severely impaired with the left hand. (*Id.*) Manual dexterity was low average bilaterally. (*Id.*) Verbal and nonverbal abstract reasoning were moderately impaired and borderline,

respectively.  (R. 710.)  Performance on a measure of planning was slow and in the

borderline range overall.  (*Id.*)  Novel problem solving was grossly within normal limits.

(*Id.*)  Cognitive flexibility was low average and verbal fluency was average considering

her age, sex, race, and level of education.  (*Id.*)

Dr. Venables diagnosed Plaintiff with mild intellectual disability and significant

symptoms of depression and anxiety.  (*Id.*)  Dr. Venables offered the following

recommendations:

> 1. It is recommended that these results be considered in conjunction with other laboratory and diagnostic findings to best appreciate their significance.
>
> 2. Given her diagnosis of mild intellectual disability, she should be eligible for county services available to individuals with developmental delays.  If she is interested in pursuing county services, it is suggested that she meet with a social worker for assistance in obtaining services.
>
> 3. It is recommended that she continue to receive assistance with instrumental activities of daily living, including medication and financial management.
>
> 4. Supervised use of memory aids is recommended (e.g. a daily planner, calendar, task list) to help in organizing and remembering daily activities, appointments, and other important information.
>
> 5. It is recommended that she avoid multitasking and attempt to eliminate potential distractions from her environment when engaging in tasks that require concentration.
>
> 6. Her relatively global cognitive deficits would likely interfere with her ability to maintain competitive employment; however, she may have the cognitive ability to perform jobs similar to those she has held in the past.  She should avoid jobs that are highly dependent on speed, abstract reasoning, planning, and math calculations.  Issues related to her how [sic] physical symptoms may affect her ability to work are deferred to her treating physicians.

(*Id.*)

On May 17, 2017, Plaintiff followed up with the rheumatology clinic.  (R. 718.)
Plaintiff reported a possible slight improvement in cognitive function but still
significantly worse than baseline mostly as to comprehension.  (*Id.*)  Plaintiff also
claimed that the gabapentin had improved her burning sensation, while numbness and
tingling were still present but to lesser degree.  (*Id.*)  She also noted that she had not been
able to sleep the prior night due to intense burning pain in her feet.  (*Id.*)  Her
neurological examination showed that she had abnormal sensation of feet, but the
strength of her extremities and grip were within normal limits.  (R. 721.)  Plaintiff was
going to be started on Rituxan.  (R. 722.)

On May 23, 2017, Plaintiff received her first Rituxan infusion.  (R. 742.)  She
denied any new problems.  (*Id.*)  She received an additional Rituxan infusion on June 6,
2017.  (R. 748.)  Again, she reported no new problems.  (*Id.*)

On August 14, 2017, Plaintiff followed up with her neurologist, Dr. Maiser.  (R.
754.)  She claimed her neuropathic symptoms were about the same.  (*Id.*)  They
continued to be most painful in her toes and her fingertips and bothered her mostly at
night.  (*Id.*)  There had been no progression of her symptoms.  (*Id.*)  Plaintiff rated her
pain as a 4/10, whereas it was a 7/10 at diagnosis.  (*Id.*)  She was experiencing excessive
sleepiness with her gabapentin and asked if she could reduce her daytime doses.  (*Id.*)
Plaintiff reported no falls, did not believe she had gotten necessarily weaker, and felt like
her hand grip was weak but nothing changed since her last visit.  (*Id.*)  Plaintiff did
endorse symptoms of depression but was reluctant to start medication.  (R. 755.)
Plaintiff's physical examination showed that Plaintiff was well groomed, she was very

pleasant and cooperative, she showed good eye contact, and her speech was clear. (*Id.*) Plaintiff's motor exam continued to show normal tone and normal strength, including her hand grip bilaterally, and her reflexes in her upper extremities were preserved as well as her knee jerks. (*Id.*) Sensory exam to light touch caused dysesthesias and somewhat of an allodynia predominantly at the fingertips in both hands but nothing more proximal. (*Id.*) In her lower extremities, it was essentially the entire foot that was uncomfortable to light touch. (*Id.*) Her gait was otherwise unrevealing. (*Id.*) Dr. Maiser's impression for Plaintiff was that she had a Sjogren's related sensory predominant neuropathy presenting as bilateral feet and fingertip paresthesias, without motor weakness. (*Id.*) Dr. Maiser recommended she follow up with the rheumatology clinic for additional Rituxan infusions but noted that Plaintiff had yet to see a benefit. (*Id.*) Dr. Maiser also noted that he worried about depression and hoped that medication for depression could be started. (*Id.*)

On August 29, 2017, Plaintiff had a follow-up rheumatology appointment. (R. 764.) She stated her neuropathy felt the same as it was prior to the Rituxan infusions and her cognitive function continued to slowly decline, giving as one example that "what I mean to say isn't what comes out." (*Id.*) The neurological examination of Plaintiff showed decreased sensation of finger and toes and that she had a better flow of conversation compared to previous visit before Rituxan. (R. 767.) Further, the strength on her extremities and her grip was within normal limits. (R. 768.) CNP Werner noted that "Pt tolerated Rituxan well however has not noticed a significant change. However, she has quit working and has not been engaged in stimulating activity. Throughout exam

today my assessment is that she is able to better communicate and her thinking process is sharper and more readily able to answer questions." (*Id.*)

On May 21, 2018, Plaintiff followed up with her primary care doctor, Dr. Brianna Johnson. (R. 796.) Plaintiff reported being stressed because her mother had cancer. (*Id.*) Plaintiff also reported that she had been forgetting to take her Plaquenil because she had been taking care of her mother. (*Id.*) In addition, Plaintiff noted that she was "[s]till having the tingling in hands and feet. Constant. No change. No worsening or improvement. No weakness." (R. 797.) Her neurological examination showed as follows: "Speech clear, follows commands, alert and oriented. Grip strength 5/5 bilaterally." (*Id.*) In addition, her mood and affect were congruent. (R. 798.) It was also noted that Plaintiff had not been able to have a follow-up with neurology and rheumatology since August of 2017. (*Id.*)

Plaintiff followed up with her primary care doctor the next month on June 18, 2018. (R. 808.) She noted that her mother was still in a facility for cancer treatment. (R. 808-09.) Plaintiff's neurological and psychiatric examinations were normal. (R. 809.) Plaintiff was symptomatically stable, but Plaintiff requested that a medical opinion form be filled out and wanted an inquiry as to whether her paresthesias are permanent and whether she would be able to perform employment that she would be able to tolerate. (R. 810.) At this appointment, Dr. Johnson filled out a medical opinion form for two months of benefits to allow Plaintiff to follow up with neurology and rheumatology. (*Id.*)

On June 25, 2018, Plaintiff returned to the rheumatology clinic. (R. 817.) Plaintiff represented that her thinking was stable but that her stress had increased due to

her mother's cancer treatment. (*Id.*) In addition, the numbness and tingling of her fingertips and toes was stable. (*Id.*) She also reported poor sleep as well as headaches and extremity stiffness. (*Id.*) Her neurological examination showed that she was able to spell forwards and backwards, was able to flow with conversation, and had good recall. (R. 821.) She also had fingertip and toe numbness/tingling with palpitation and light touch. (*Id.*) The strength of Plaintiff's extremities and grip were within normal limits. (R. 822.) Given that Plaintiff had an initial improvement of cognitive function on exam post-Rituxan, and was experiencing worsening headaches and joint stiffness, another course of Rituxan was recommended, as well as Plaquenil. (*Id.*)

On July 19, 2018, Plaintiff was seen by psychologist Rebecca Floyd, Ph.D., L.P. (R. 833.) The mental health status exam showed that Plaintiff was in no apparent distress and casually groomed; she was cooperative, engaged and pleasant; her speech rate, articulation, spontaneity, and volume were normal; her speech coherence was rambling; she was depressed and anxious; she showed an appropriate affect; her thought process was logical/goal-directed; her thought process rate and content were normal; she had no suicidal ideation; she had no abnormal perception; and her insight and judgment were adequate. (R. 833-34.) Plaintiff noted that her "syndrome" was taking a toll on her. (R. 834.) She claimed the impact on her functioning was more forgetfulness and a sad mood during which she did not communicate. (*Id.*) Plaintiff noted that she had been taking care of her mom who had been recovering from surgery and had cancer. (*Id.*) She also claimed she was able to give her mom her meds, but that she would forget to take her own. (*Id.*) The psychologist gave Plaintiff a provisional diagnosis of adjustment disorder

with mixed anxiety and depressed mood and instructed her to return in four weeks for a diagnostic assessment.  (R. 833, 835.)

On August 17, 2018, Plaintiff followed up with her neurologist, who noted that she had been lost to follow-up for a year while taking care of her mother.  (R. 849.)  Her neurologist noted that although Plaintiff had finished her second cycle of Rituxan a couple weeks earlier, she reported no change in her paresthesias, which remained in her feet and fingers with no other sensory changes.  (R. 850.)  Plaintiff acknowledged that the "paresthesias are worse at night and don't bother her too much during the day."  (*Id.*)  Dr. Maiser's neurological exam for Plaintiff showed that she was alert and oriented; her strength bilaterally was normal; her coordination was intact; she experienced neuropathic pain in her toes, fingers, and distal foot; she exhibited a normal Romberg; and she demonstrated normal gait.  (R. 851.)  Dr. Maiser opined that neurologically Plaintiff had remained stable compared to the previous year.  (*Id.*)  Dr. Maiser was unsure whether there was an improvement in cognitive function.  (R. 852.)  Plaintiff also noted that even though her gabapentin helped somewhat with the pain, she was interested in "more medications" for better relief.  (R. 850.)  Dr. Maiser prescribed Plaintiff with Cymbalta to help with her pain and possibly also help with her symptoms of depression.  (R. 852.)

Plaintiff again saw psychologist Dr. Floyd on August 29, 2018.  (R. 857.)  Plaintiff represented that she had previously attended nursing assistant school and graduated, receiving a certificate, but claimed that she had difficulty maintaining employment in this field as she was not as fast as everyone else in performing her duties.  (*Id.*)  The mental health status exam showed that Plaintiff was in no apparent distress and casually

groomed; she was cooperative, engaged and pleasant; her speech rate, articulation, spontaneity, and volume were normal; her speech coherence was rambling; she was depressed and anxious; she showed an appropriate affect; her thought process was logical/goal-directed; her thought process rate and content were normal; she had no suicidal ideation; she had no abnormal perception; and her insight and judgment were adequate. (R. 857-58.) Her strengths included being a quick learner. (R. 858.) Plaintiff represented that she forgot things when she was in a hurry. (*Id.*) She claimed that she was currently on an antidepressant, which she had started a week earlier, and reported it was helping with her energy. (*Id.*) Plaintiff endorsed the following depressive symptoms: anhedonia, insomnia, fatigue, feelings of worthlessness/guilt, difficulty concentrating, and impaired memory. (*Id.*) Plaintiff's depression was due to her mother's health problems. (R. 858-59.) The diagnosis was persistent depressive disorder. (R. 857.)

On September 13, 2018, Plaintiff had a follow up with the rheumatology clinic. (R. 864.) CNP Werner noted as follows:

> HA's are now infrequent, this is an improvement. Energy goes up and down. Denies joint pain and stiffness today which is also an improvement. Since starting cymablta she thinks she has a little more energy, the neuropathy is also slightly improved, it is still there but not as "high", now it is mild. She noticed when she missed a dose of cymbalta her numb [sic] and tingling were worse. Reports social events of going to the state fair and concert.

(R. 864-65.) CNP Werner felt that there had been an unspecified "improvement in symptoms" with Rituxan. (R. 869.)

**B.      Relevant Medical Documents Submitted to the Appeals Council**

On November 2, 2018, Plaintiff was seen by the psychologist Dr. Floyd.  (R. 41.)

Plaintiff had presented with concerns of coping with her health, especially her Sjogren's

syndrome.  (R. 42.)  The mental health status exam showed that Plaintiff was in no

apparent distress and casually groomed; she was cooperative, engaged, and pleasant; her

speech rate, articulation, spontaneity, and volume were normal; her speech coherence was

rambling; she was depressed and anxious; she showed an appropriate affect; her thought

process was logical/goal-directed; her thought process rate and content were normal; she

had no suicidal ideation; she had no abnormal perception; and her insight and judgment

were adequate.  (R. 41-42.)  Plaintiff endorsed symptoms of both depression and anxiety.

(R. 43-44.)  Dr. Floyd diagnosed Plaintiff with persistent depressive disorder; major

depressive disorder, recurrent, moderate; mild intellectual disability; generalized anxiety

disorder; alcohol use disorder, severe, in sustained remission; and cannabis use disorder,

severe, and sustained remission.  (R. 46.)  Dr. Floyd also opined as follows:

> The patient is experiencing Mild psychosocial stress.  Additional stressors
> include: financial stress, chronic health condition(s) (including nerve
> damage), underemployment, and concerns about her mother's health.
> Functional impairments included: mobility, cognitive functioning, social
> functioning, leisure activity, and occupational functioning.    Pt is
> experiencing significant symptoms of depression and anxiety that were
> worsened onset of symptoms of Sjogren's syndrome in July of 2016.  Pt has
> struggled to manage the symptoms of this syndrome and the impact they have
> had on her functioning in multiple domains.  Additionally, these symptoms
> have appeared to affect her ability to engage in physically active employment
> and options for alternative types of employment may be further restricted by
> cognitive challenges.  Her loss of employment also appears to have had
> consequence of reducing her social functioning.  Opportunities for expanding
> social activity appear as well to be hampered by depression as pt reportedly
> has little interest in engaging in leisure activities.  Accordingly, her mom

> expresses desire for her to reduce depressive symptoms by increasing social and behavioral activity, such as through returning to work or taking an interest in leisure or volunteer activities. Both perceive her reported lack of identification of things that are meaningful to her or provide her with a sense of purpose as barriers to her getting involved in new activities. Pt may benefit from an acceptance and commitment therapy approach to treatment due to its focus on values based living in spite of chronic conditions; values clarification is an important component of this treatment approach.

(R. 46-47.) Plaintiff's treatment plan included increasing social and physical activity, coping strategies for anxiety, a consult with a psychiatrist as to her medications, start of a trial of brief individual psychotherapy, and to "[c]onsider referral for Partial Hospitalization Program or Day Treatment." (R. 47.)

On November 15, 2018, Plaintiff saw Dr. Maiser for a neurology appointment. (R. 53.) Plaintiff's chief concern was neuropathy. (*Id.*) Plaintiff's neuropathic symptoms in her hands and feet had continued, but they had neither worsened nor improved. (*Id.*) She reported excessive fatigue and depression. (*Id.*) She also had noticed that her right foot was starting to curl in a bit and that she needed to stretch it out. (*Id.*) It was noted that she was having a disability hearing the following week. (*Id.*) In addition, Dr. Maiser noted that Plaintiff did not use an assistive device, she did not have any falls, but she needed to take frequent breaks, as she felt off balance because of her neuropathy. (*Id.*) Plaintiff's examination showed her to be pleasant and alert, but in a depressed mood. (R. 55.) Further, Plaintiff's strength was normal, her coordination was intact, she claimed allodynia to toes and distal foot and fingertips, her Romberg was unsteady, and her gait was slow and antalgic. (*Id.*) Dr. Maiser noted that Plaintiff

remained stable neurologically, but that her gait had worsened.  (*Id.*)  Plaintiff was referred to physical therapy for her gait.  (*Id.*)

On December 21, 2018, Plaintiff attended another therapy appointment with her psychologist.  (R. 58.)  The results of the mental status examination were similar to the previous appointment, except that Plaintiff's affect was reactive.  (*Id.*)  Plaintiff's diagnosis remained the same.  (*Id.*)  Plaintiff reported that she had attended a concert. (*Id.*)  Her treatment plan included being more social and physically active.  (*Id.*)  Plaintiff also considered day treatment or partial hospitalization and ultimately chose to proceed with the day treatment.  (R. 60.)  The therapy records called the day treatment program "an intensive, recovery oriented psychiatric rehabilitation program."  (*Id.*)  The day treatment program typically lasted two to six months depending on symptom severity, and the services were four to five days per week, three hours per day, with mandatory daily attendance.  (R. 61.)

On January 16, 2019, Plaintiff had her first physical therapy ("PT") appointment. (R. 64.)  Plaintiff reported that she did not use an assistive device, she had not been previously seen by PT, she did not fall but needed to take frequent breaks, and that she felt off balance because of her neuropathy.  (R. 65.)  Her main complaints were pain in her entire body and fatigue.  (*Id.*)  She was able to cook, eat, and take medication on her own, but needed assistance with dressing, shopping, laundry, and cleaning.  (R. 66.)  She also reported being able to walk somewhat less than two blocks due to fatigue.  (*Id.*) Plaintiff constantly experienced numbness and tingling in her hands and feet.  (*Id.*)  No deficits in the range of motion of her upper extremities were noticed.  (*Id.*)  Her physical

therapist observed range of motion deficits in her lower extremities. (*Id.*) In performing

a full-strength test, the physical therapist noted that her upper and lower extremities, right

and left sides, both had strength of 3-/5. (R. 67.) Plaintiff fatigued quickly and had

impaired posture while engaged in unsupported sitting. (*Id.*) Plaintiff also performed

five sit-to-stands in 14.36 seconds, which indicated she was at an increased risk for falls.

(*Id.*) Plaintiff's heel to shin coordination was not within normal limits due to her limited

range of motion and strength. (R. 68.) Otherwise, her coordination was within normal

limits. (*Id.*) The physical therapist found that Plaintiff had "pain at multiple locations,

generalized weakness, fatigue with decreased activity tolerance, [was] a high falls risk,

and [lacked] a comprehensive HEP/activity to assist her with achieving her goals." (*Id.*)

## III.  LEGAL STANDARD

Judicial review of an ALJ's denial of benefits is limited to determining whether

substantial evidence on the record as a whole supports the decision, 42 U.S.C. § 405(g);

*Chismarich v. Berryhill*, 888 F.3d 978, 979 (8th Cir. 2018), or whether the ALJ's

decision results from an error in law, *Nash v. Comm'r, Soc. Sec. Admin.*, 907 F.3d 1086,

1089 (8th Cir. 2018). As defined by the Supreme Court:

> The phrase "substantial evidence" is a "term of art" used throughout
> administrative law to describe how courts are to review agency factfinding.
> Under the substantial-evidence standard, a court looks to an existing
> administrative record and asks whether it contains sufficient evidence to
> support the agency's factual determinations. And whatever the meaning of
> "substantial" in other contexts, the threshold for such evidentiary sufficiency
> is not high. Substantial evidence . . . is more than a mere scintilla. It means—
> and means only—such relevant evidence as a reasonable mind might accept
> as adequate to support a conclusion.

*Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

"[T]his court considers evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Nash*, 907 F.3d at 1089 (cleaned up). "If substantial evidence supports the Commissioner's conclusions, this court does not reverse even if it would reach a different conclusion, or merely because substantial evidence also supports the contrary outcome." *Id.* "In other words, if it is possible to reach two inconsistent positions from the evidence, and one of those positions is that of the [ALJ], the Court must affirm the decision." *Jacob R. v. Saul*, No. 19-CV-2298 (HB), 2020 WL 5642489, at *3 (D. Minn. Sept. 22, 2020) (citing *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992)).

In reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact for that of the ALJ. *See Hilkemeyer v. Barnhart*, 380 F.3d 441, 445 (8th Cir. 2004). Assessing and resolving credibility is a matter properly within the purview of the ALJ. *See Chaney v. Colvin*, 812 F.3d 672, 676 (8th Cir. 2016) (citing *Edwards v. Barnhart*, 314 F.3d 964, 966 (8th Cir. 2003)) ("Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide.").

## IV.   <u>DISCUSSION</u>

Plaintiff raises three issues to the Court: (1) the ALJ erred at step three by failing to find that Plaintiff's impairments met Listing 12.05 for Intellectual Disability; (2) the ALJ erred in his assessment of Plaintiff's RFC by determining that she could frequently finger, handle, and feel; and (3) the Appeals Council erred by failing to consider evidence submitted after the hearing, but which related to the period at issue regarding her claims of anxiety and her gait. (Dkt. 22). The Court will address these arguments in turn.

29

A.      Listing 12.05

Plaintiff first argues that the ALJ erroneously determined that she does not meet or medically equal the criteria of Listing 12.05(B). The Commissioner's regulations provide that certain impairments are considered "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. §§ 404.1525(a), 416.925(a). Such conditions are described in the Listing of Impairments, 20 C.F.R. § 404, Subpart P, Appendix 1. Plaintiff has the burden of proof to establish that her impairment meets or equals a listing. *See Johnson v. Barnhart*, 390 F.3d 1067, 1070 (8th Cir. 2004) (citing *Sullivan v. Zebley*, 493 U.S. 521, 530-31 (1990)). A claimant must point to specific evidence to establish that she meets each requirement of the listing. *See Sullivan*, 493 U.S. at 530. "Merely being diagnosed with a condition named in a listing and meeting some of the criteria will not qualify a claimant for presumptive disability under the listing. 'An impairment that manifests only some of the listing criteria, no matter how severely, does not qualify.'" *McCoy v. Astrue*, 648 F.3d 605, 611-12 (8th Cir. 2011) (cleaned up) (quoting *Sullivan*, 493 U.S. at 530).

To demonstrate that she is disabled under Listing 12.05, a Social Security claimant must satisfy three criteria. *See Cronin v. Saul*, 945 F.3d 1062, 1067 (8th Cir. 2019). First, a claimant must have a subaverage general intellectual functioning as shown by a full-scale IQ score of 70 or below. *Id.* (quoting 20 C.F.R. § 404, Subpt. P, App. 1 § 12.05(B)(1)(a)). Second, a claimant must show significant "deficits in adaptive functioning currently manifested by extreme limitation of one, or marked limitation of two, of the following areas of mental functioning: a. Understand, remember or apply

30

information[;] or b. Interact with others[;] or c. Concentrate, persist, or maintain pace[;] or d. Adapt or manage oneself[.]"[5] *Id.* (quoting Listing 12.05(B)(2)).  Third, a claimant must show that the mental disorder began before she turned age 22.  *Id.* (quoting Listing 12.05(B)(3)).

Plaintiff argues the ALJ erred by finding that she only had a moderate limitation in understanding, remembering, or applying information and only had a moderate limitation in a concentrating, persisting, or maintaining pace.[6]  (Dkt. 22 at 22-24.)  Plaintiff also asserted that she met the requirement that she have a subaverage intelligence as evidenced by her full-scale IQ score and that her intellectual and adaptive functioning deficits began before she reached the age of 22.  (*Id.* at 23-25.)  The Commissioner

---

[5]    Under these listings, the five rating points are defined as follows:

a.  No limitation (or none).   You are able to function in this area independently, appropriately, effectively, and on a sustained basis.

b.  Mild limitation.   Your functioning in this area independently, appropriately, effectively, and on a sustained basis is slightly limited.

c.  Moderate limitation.   Your functioning in this area independently, appropriately, effectively, and on a sustained basis is fair.

d.  Marked limitation.   Your functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited.

e.  Extreme limitation.   You are not able to function in this area independently, appropriately, effectively, and on a sustained basis.

20 C.F.R. § Pt. 404, Subpt. P, App. 1 § 12.00(F)(2).
[6]    Plaintiff does not argue that the ALJ erred by finding that she did not have marked limitations as to her ability to interact with others or adapt or manage herself.

conceded that the ALJ misstated Plaintiff's processing speed index as 92, instead of 62, but argued that this misstatement and Plaintiff's claim of "cherry picking" has no bearing on the fact that the ALJ found that Plaintiff had full scale scores of 57 and 62.[7]  (Dkt. 29 at 4-5.)  The Commissioner asserted that Plaintiff's argument as to Listing 12.05 fails because she did not prove two marked impairments.  (*Id.* at 6-9.)

With respect to Listing 12.05, the ALJ found in relevant part as it relates to Plaintiff's domains of mental functioning as follows:

> In understanding, remembering, or applying information, the claimant has a moderate limitation.  She reports receiving special education instruction throughout her entire school career but graduated from high school and received certification from nursing assistance school.  (Exhibits C6F2, C9F66, and C11F11)  The claimant indicates her most recent job entailed working as a seasonal employee doing cashier duties in a concessions stand at Target Field/Stadium.  (Exhibit C6F2)  She states she requires reminders for personal care and admits she forgets things when she is in a hurry or rushing.  (Exhibits C7E3 and C11F11)  During intelligence testing in December 2016, as assessed by the Wechsler Adult Intelligence Scale - Fourth Edition (WAIS-IV), her verbal responses on the vocabulary subtest were often too vague for credit.  (Exhibit C6F3)  For instance, she defined the word "breakfast" as "something you have in the morning".  Nevertheless, the consultative psychological examiner concludes the intelligence testing is considered an accurate reflection of her current level of cognitive functioning.  She has a full-scale IQ score of 57, which is at a level equal to or greater than 0.2 of 100 adults her age and falling within the impaired range. In regard to a gross estimate of cognitive functioning, this claimant earns a verbal comprehension index score of 63, perceptual reasoning index of 67,

---

[7]     The Court notes that the ALJ decided to disregard the full-scale IQ score of 57 because the majority of her underlying scores, such as her processing and verbal comprehension were around the borderline range of 70 (although also under 70).  (R. 18.) However, the Listing is clear that this element is met with a full-scale IQ score 70 or less, which is undisputedly the case in the present record (and ignores the April 27, 2017 full-scale IQ score of 62).  *See* 20 C.F.R. § 404, Subpt. P, App. 1 § 12.05(B)(1)(a).  The ALJ's decision to disregard § 12.05(B)(1)(a) was improper as "an agency's failure to follow its own binding regulations is a reversible abuse of discretion."  *Carter v. Sullivan*, 909 F.2d 1201, 1202 (8th Cir. 1990) (per curiam) (citations omitted).

processing speed index of 92, and working memory index of 58.  Additional memory testing, as assessed by the Wechsler Memory Scale - IV Edition (WMS-IV), reveals the claimant has an auditory memory index of 74, delayed memory index of 69, immediate memory index of 67, visual memory index of 69, and visual working memory index of 67.  (Exhibit C6F4)  The consultative psychological examiner states her memory index scores are commensurate with her overall level of cognitive functioning.  Repeat neuropsychological testing conducted on April 27, 2017, found the claimant's general intellectual functioning was in the extremely low range with the full-scale IQ score of 62.  (Exhibit C9F67)  The testing neuropsychologist concludes there is no significant difference between the borderline nonverbal intellectual abilities and extremely low verbal intellectual abilities.  The remaining findings are consistent with previous testing.

\* \* \*

With regard to concentrating, persisting, or maintaining pace, the claimant has a moderate limitation.  She needs to re-read written instructions repeatedly.  (Exhibit C7E6)  She states she has had difficulty maintaining employment in nursing assistance/personal care attendant (PCA) field because she was not as fast as everyone else in performing her job duties.  (Exhibit C11F11)  Her aunt reports she completes household chores poorly.  (Exhibit C6F3)  The claimant describes her pace of daily activities as slow, persistence as slow, and concentration as poor.  She further notes supervisors have expressed concerns about her slow speed in completing tasks and making mistakes in counting money at times.  (Exhibit C9F67)  During the consultative psychological exam in December 2016, the claimant has a slow problem-resolution pace and during the initial subtest involving the manipulation of blocks she relies solely on her left hand.  (Exhibit C6F3)  Repeat neuropsychological testing in late April 2017, reveals the claimant's performance on measures of executive functioning is variable.  (Exhibit C9F68)

(R. 15-17; *see also* R. 18.)  The Court will proceed with addressing the ALJ's decision as to these two domains.

## 1.      Understanding, Remembering, or Applying Information

According to the Commissioner's regulations, the area of mental function relating to understanding, remembering, or applying information refers to:

> [T]he abilities to learn, recall, and use information to perform work activities. Examples include: Understanding and learning terms, instructions, procedures; following one- or two-step oral instructions to carry out a task; describing work activity to someone else; asking and answering questions and providing explanations; recognizing a mistake and correcting it; identifying and solving problems; sequencing multi-step activities; and using reason and judgment to make work-related decisions. These examples illustrate the nature of this area of mental functioning. We do not require documentation of all of the examples.

20 C.F.R. § Pt. 404, Subpt. P, App. 1 § 12.00E(1).

With respect to understanding, remembering, or applying information,[8] the Court finds that the ALJ's decision that Plaintiff had a moderate limitation is supported by substantial evidence in the record as a whole. The Court acknowledges Plaintiff's argument that she was only able to graduate high school with the support of special education throughout her entire schooling. (Dkt. 31 at 3.) However, as she noted during her medical examinations, not only was she able to graduate from high school, but she does not dispute that she was able to understand, remember, and apply information sufficiently to have a completed a nursing program and to have worked as a nursing assistant/home attendant, which involved dispensing medication, and work at the airport in the past with duties involving assisting unaccompanied children and wheelchair transport. (R. 136-37, 709, 857.) In addition, she does not dispute that she was able to work in concessions at Target Field and Target Center until she had to stop working in 2016 due to physical symptoms, as opposed to any deficit in understanding,

---

[8]     The Court notes "that the greatest degree of limitation of any part of the area of mental functioning directs the rating of limitation of that whole area of mental functioning." 20 C.F.R. § Pt. 404, Subpt. P, App. 1 § 12.00(F)(3)(f).

remembering, or applying information.  (R. 709.)  As noted by the Commissioner (Dkt 29 at 6-7), a home attendant and cashier are a reasoning level of 3, showing an ability beyond following one- or two-step instructions and making decisions.  *See* DOT 211.462-010 Cashier II, DICOT 211.462-010 (level 3 reasoning); DOT 354.377-014 Home Attendant (level 3 reasoning).  "'Level-three reasoning requires the ability to apply 'commonsense' understanding to carry out instructions furnished in written, oral, or diagrammatic form.'"  *Thomas v. Berryhill*, 881 F.3d 672, 677 (8th Cir. 2018) (quoting *Hulsey v. Astrue*, 622 F.3d 917, 923 (8th Cir. 2010)).  Level three reasoning necessitates an ability greater than the ability to perform one- and two-step tasks.  *See id.* at 677.

Plaintiff points to the testing results from Dr. Lopno showing a low working memory score, his opinion that Plaintiff has a global weakness in memory and comprehension, and Dr. Venables' finding that Plaintiff had auditory attention/working memory in the extremely low range, as evidenced by the fact she was markedly limited in her ability to remember.  (Dkt. 22 at 22-23; Dkt. 31 at 3-4.)  However, the substantial evidence in the record as a whole supports a moderate limitation.  Indeed, despite Plaintiff's weakened global memory and comprehension, Dr. Lopno opined that Plaintiff was able to understand, remember, and follow simplified instructions.  (R. 617.)  In addition, the state agency psychologist opined after Dr. Lopno's examination and testing that Plaintiff was moderately limited as to her ability to understand and remember detailed instructions.  (R. 189-90.)  As part of this opinion the state agency psychologist found that Plaintiff was not significantly limited as to her ability to remember locations and work-like procedures or in her ability to understand and remember very short and

simple instructions.  (R. 189.)  Plaintiff relies on Dr. Venables' testing results indicating that Plaintiff's auditory attention and working memory were in the extremely low range. (R. 709.)  However, while the results regarding Plaintiff's working memory were extremely low, the other memory scores ranged between borderline to average.  (*Id.*) Regardless of the testing scores, it was Dr. Venables' opinion that Plaintiff "may have the cognitive ability to perform jobs similar to those she has held in the past" (R. 710), which in this case involved level three reasoning.  Further, Plaintiff professed that one of her strengths was that she a quick learner.  (R. 858.)  Indeed, Plaintiff herself noted that while she had difficulty following written instructions, she could understand spoken instructions "pretty well if explained that clearly."  (R. 379.)  Moreover, Plaintiff, despite her claims of forgetfulness, had the capability of managing other individual's medications as part of home attendant employment, and the medical record demonstrates that she was able to take care of her mother, who suffered from cancer, and manage her medications. (*See, e.g.*, R. 834.)

It is important to note that the ALJ did take into account Plaintiff's limitations as evidenced by the fact that he assessed Plaintiff with a moderate limitation.  The Court will not reverse the Commissioner even if, sitting as finder of fact, it would have reached a contrary result, as "[a]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984).

## 2.    Concentrating, Persisting, or Maintaining Pace

With respect to concentrating, persisting, or maintaining pace, Plaintiff argued that the ALJ did not identify any facts showing Plaintiff had a less than marked limitation in this area, and that the ALJ in fact acknowledged that she needed to reread written instructions repeatedly, had difficulty maintaining employment because she was not as fast as everyone else, performed household chores poorly, was slow in completing her activities of daily living, made mistakes while counting money, had a slow problem resolution pace during psychological testing in 2016, and had variable executive functioning in neuropsychological testing in 2017.[9]  (Dkt. 22 at 23-24.)  Plaintiff also asserted that the record otherwise supports a marked limitation, including: Dr. Venables' recommendation that Plaintiff continue to receive assistance with instrumental activities of daily living, including medication and financial management; should avoid multitasking and attempt to eliminate potential distractions from her environment when engaging in tasks that require concentration; and should also avoid jobs that are highly dependent on speed, abstract reasoning, planning, and math calculations.  (*Id.* at 24 (citations omitted).)  The Commissioner counters that the moderate limitation imposed by the ALJ and the finding that she needed to complete simple routine tasks at a nonproduction pace is congruent with Dr. Venables' statement that Plaintiff avoid multitasking and attempts to eliminate potential distractions from her environment when

---

[9]    The Court notes that the mere fact that an ALJ did not thoroughly discuss each piece of medical evidence does not warrant remand as long as an ALJ's conclusion as to whether a claimant meets a listing is supported by substantial evidence.  *See Vance v. Berryhill*, 860 F.3d 1114, 1118 (8th Cir. 2017).

engaging in tasks that require concentration.  (Dkt. 29 at 8.)  The Commissioner also

relied on the ALJ's analysis of the RFC where it was noted that Plaintiff's daily activities,

including taking care of her mother, support the ALJ's moderate limitation.  (*Id.* at 9.)

According to the Commissioner's regulations, the area of mental function

relating to concentrating, persisting, or maintaining pace refers to:

> 3. Concentrate, persist, or maintain pace (paragraph B3).  This area of mental
> functioning refers to the abilities to focus attention on work activities and
> stay on task at a sustained rate.  Examples include: Initiating and performing
> a task that you understand and know how to do; working at an appropriate
> and consistent pace; completing tasks in a timely manner; ignoring or
> avoiding distractions while working; changing activities or work settings
> without being disruptive; working close to or with others without interrupting
> or distracting them; sustaining an ordinary routine and regular attendance at
> work; and working a full day without needing more than the allotted number
> or length of rest periods during the day.  These examples illustrate the nature
> of this area of mental functioning.  We do not require documentation of all
> of the examples.

20 C.F.R. § Pt. 404, Subpt. P, App. 1 §12.00E(3).

Here, psychologist Dr. Lopno, who conducted a psychological evaluation of

Plaintiff, found that she could sustain limited/fleeting attention and concentration and

carry out work-like tasks with limited persistence and at a slow pace.  (R. 617.)  State

agency psychologist Dr. Kennedy opined that Plaintiff was not significantly limited as to

her ability to: carry out very short and simple instructions, maintain attention and

concentration for extended periods, perform activities within a schedule, maintain regular

attendance, and be punctual within customary tolerance; sustain an ordinary routine

without special supervision and  work in coordination with or in proximity to others

without being distracted by them; make simple work-related decisions and complete a

normal workday and workweek without interruptions from psychologically based symptoms; and perform at a consistent pace without an unreasonable number and length of rest periods. (R. 189-90.)  On March 2, 2017, Plaintiff's treating provider opined that while Plaintiff's symptoms would interfere with her ability to maintain persistence and pace necessary to engage in employment, he concluded that she only had a moderate impairment as to her ability to maintain concentration, persistence, and pace.  (R. 621, 623.)  Again, as mentioned previously, the medical record shows that Plaintiff stopped working due to physical symptoms, as opposed to a mental inability to keep pace or otherwise concentrate on her work.  (R. 709.)  Further, despite Plaintiff's claimed forgetfulness, she represented to psychologist Dr. Floyd that she was taking care of her cancer-stricken mother and administering her medication.  (R. 834.)  In addition, even though Dr. Venables opined that she believed that Plaintiff needed help organizing and remembering daily activities, needed a daily planner to remember daily activities and appointments, and recommended that she avoid multitasking and attempt to eliminate potential distractions from her environment when engaging in tasks that require concentration, she also opined that Plaintiff "may have the cognitive ability to perform jobs similar to those she has held in the past.  She should avoid jobs that are highly dependent on speed, abstract reasoning, planning, and math calculations." (R. 710.)  In other words, while Dr. Venables found Plaintiff's ability to concentrate and keep pace to be impaired, it was not to the extent that it would preclude her from her past work, thereby also supporting the ALJ's finding of moderate impairment as to this domain of functioning.  As such, the Court finds that the ALJ's decision that she was moderately

impaired with respect to concentrating, persisting, or maintaining pace to be supported by substantial evidence.

**B.     RFC: Whether Plaintiff Could Frequently Finger, Handle, and Feel**

A disability claimant has the burden to establish her RFC.  *See Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004).  The Eighth Circuit has held that "a 'claimant's residual functional capacity is a medical question.'"  *Id.* (quoting *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001)).  "'[S]ome medical evidence' must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's 'ability to function in the workplace.'"  *Id.* (quoting *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir. 2000) (per curiam)).  However, "there is no requirement that an RFC finding be supported by a specific medical opinion."  *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016) (citing *Myers v. Colvin*, 721 F.3d 521, 526-27 (8th Cir. 2013); *Perks v. Astrue*, 687 F.3d 1086, 1092-93 (8th Cir. 2012)).  Rather, the RFC should be "'based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'"  *Id.* (quoting *Myers*, 721 F.3d at 527).  Indeed, "'[e]ven though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner.'"  *Perks*, 687 F.3d at 1092 (citations omitted) (quoting *Cox*, 495 F.3d at 619-20).

As set forth previously, the ALJ found that Plaintiff had the following RFC:

[T]o perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except the individual may never climb ropes, ladders, or scaffolds; and may occasionally climb ramps and stairs, balance, stoop,

kneel, crouch, and crawl. **The individual may frequently handle, finger, and feel.** The individual may have no exposure to vibration, unprotected heights, or hazards. And, finally, the individual would be limited to simple routine tasks at a nonproduction pace (i.e., no hourly quotas).

(R. 19 (emphasis added).)

Plaintiff argues that the ALJ "played doctor" in determining that she could handle, finger, and feel based only on strong hand grip during certain examinations. (Dkt. 22 at 26.) Plaintiff emphasized that the ALJ failed to explain how Plaintiff's numbness and tingling, which never resolved, affected these abilities. (*Id.*) Plaintiff also asserted that the ALJ ignored the test results with respect to Dr. Venables' neuropsychological testing relating to her hands despite otherwise giving weight to Dr. Venables' opinion, and ignored observations that Plaintiff had trouble holding on to her phone. (*Id.* at 27-28.) The Commissioner counters that the ALJ properly relied on the opinion of State Agency physicians Drs. Gawo and Grant who found that Plaintiff could frequently handle and finger, as well as the other medical evidence in the record supporting that Plaintiff had a normal grip strength and ability to use her hands normally, while at the same time acknowledging that Plaintiff suffered dysesthesias (abnormal sensations) related to her sensory abilities. (Dkt. 29 at 13-15.) As to Dr. Venables' 2017 testing, the Commissioner asserted that Dr. Venables did not translate these results into work limitations. (*Id.* at 14-15.) Plaintiff counters in her reply that grasping strength is not automatically determinative of her ability to finger, handle, and feel, and therefore, the Court should remand for further development because there is no evidence that the ALJ

considered the fine motor testing results or why he would have discounted this, especially when he gave credit to Dr. Venables' other opinions.  (Dkt. 31 at 10-11.)

Here, the level of Plaintiff's ability with respect to reaching, handling, fingering, and feeling is critical to the issue of whether she can perform sufficient employment in the national economy.  While the VE opined that a hypothetical person, as set forth in the RFC, who could "frequently handle, finger, and feel" could perform work in the national economy (R. 149-50), the VE also opined as follows when provided with a modified hypothetical by the ALJ:

> Q  Right.  Assume, for me, a second hypothetical individual that has all the same limitations as the first, with the following change: instead of being limited to frequent handling, and fingering, and feeling, the individual would be **limited to only occasional** handling, fingering, and feeling.  Would there be any jobs for that individual, with the rest of the limitations as they are?
>
> A  No, your honor.

(R. 149 (emphasis added).)

"Occasionally" means occurring from very little up to one-third of the time, whereas "Frequent" means occurring from one-third to two-thirds of the time.  *See* SSR 83-10 (S.S.A. 1983), Titles II & XVI: Determining Capability to Do Other Work-the Med.-Vocational Rules of Appendix 2.

The Commissioner has set the following framework with respect to evaluating reaching, handling, fingering, and feeling:

> c.  Reaching, handling, fingering, and feeling require progressively finer usage of the upper extremities to perform work-related activities.  Reaching (extending the hands and arms in any direction) and handling (seizing, holding, grasping, turning or otherwise working primarily with the whole hand or hands) are activities required in almost all jobs.  Significant

limitations of reaching or handling, therefore, may eliminate a large number of occupations a person could otherwise do. Varying degrees of limitations would have different effects, and the assistance of a VS may be needed to determine the effects of the limitations. "Fingering" involves picking, pinching, or otherwise working primarily with the fingers. It is needed to perform most unskilled sedentary jobs and to perform certain skilled and semiskilled jobs at all levels of exertion. As a general rule, limitations of fine manual dexterity have greater adjudicative significance--in terms of relative numbers of jobs in which the function is required--as the person's exertional RFC decreases. Thus, loss of fine manual dexterity narrows the sedentary and light ranges of work much more than it does the medium, heavy, and very heavy ranges of work. The varying degrees of loss which can occur may require a decision-maker to have the assistance of a VS. However, a VS would not ordinarily be required where a person has a loss of ability to feel the size, shape, temperature, or texture of an object by the finger-tips, since this is a function required in very few jobs.

SSR 85-15, 1985 WL 56857, at *7 (S.S.A. 1985), Titles II & XVI: Capability to Do

Other Work-The Medical-Vocational Rules As A Framework for Evaluating Solely

Nonexertional Impairments.

Here, starting early at the outset of her claimed disability, the medical record

shows that Plaintiff experienced numbness and tingling in her hands. (*See*, *e.g.*, R. 426,

431, 439, 441-42, 452-53, 539-40.) Although sensation to touch was present with the

tingling/numbness in her hands, there is a mention of decreased sensation to light touch

in the hands. (*See*, *e.g.*, R. 441, 453, 467, 470, 482, 491, 494, 505-06, 540.) Moreover,

she was largely reported to have normal strength to her upper extremities during this

time. (*See*, *e.g.*, R. 441-42, 453, 541.) Based on this record, State Agency Physician Dr.

Gawo opined that Plaintiff was limited with respect to her gross and fine manipulation

and limited as to her ability to feel, in that she could only frequently engage in handling,

fingering, and feeling bilaterally. (R. 161.) This was latter reaffirmed in January 2017

on reconsideration by State Agency physician Dr. Grant. (R. 187.) Dr. Gawo based his conclusions on the following: "Due to peripheral neuropathy of the hands and UEs which is predominantly sensory, handling, fingering and feeling with b/l hands/UEs is limited to frequently." (R. 161.) Dr. Grant had a similar rationale. (R. 187.)

Going forward, there is no dispute that Plaintiff continued to experience numbness and tingling in her hands, nerve sensations to touch, and pain (the pain primarily affected her during the night and did not bother her as much during the day, especially as of August 2018). (*See*, *e.g.*, R. 590, 602, 645, 651, 718, 754, 796, 821, 850.) Plaintiff continued to show normal or close to normal strength bilaterally, including her grip, despite complaints by her to the contrary, as reported by her neurology and rheumatology providers. (*See*, *e.g.*, R. 590, 602-03, 652-53, 687, 721, 768, 797.)

The ALJ opined as follows with respect to Plaintiff's ability to use her hands:

> The claimant sought out regular medical treatment from her alleged disability onset date through August 2017. **During that time, she repeated[ly] stated the numbness and tingling in her feet and hands** was most bothersome at night. (Exhibits C9Fl 12) **While she indicated her hands felt weak and she had some difficulty with handgrip, physical examinations demonstrated her handgrip was equal bilaterally and strength was 4-5/5.** (Exhibits C5F6-8 and C9F24) The strength in her feet was normal, including the intrinsic muscles. (Exhibit C9F10) **Light touch provoked tingling paresthesias in the fingertips** and throughout most of her feet but stopped just above the ankles. Her reflexes were normal except no ankle jerks bilaterally and she swayed with Romberg and struggled moderately with forward tandem but gait otherwise was normal. She had loss of sensation on the plantar surface of the bilateral feet and reduced vibration in her bilateral toes lasting about 6 seconds in spring 2017 and further reduced to 11 seconds on the right and 13 second on the left by August 2017. (Exhibits C9F24, 59, and 113)
>
> The claimant did not seek out medical treatment again until late spring 2018. Despite her lack of treatment for nine months, physical examination then and

again in August 2018 demonstrated she had normal motor tone and 5/5 strength bilaterally, including toe flexion in her extremities. (Exhibit Cl 1F4) She had normal coordination, gait, and Romberg but reflexes were absent in the lower extremities and **sensation testing revealed allodynia to toes and distal foot and fingertips**. The claimant's neurologist remarked "neurologic she remained stable compared to my exam one year ago." The neurologist again prescribed a retrial of topic lidocaine (if covered) and as well as the new medication of Cymbalta. (Exhibit C11F5) At a follow-up appointment on September 13, 2018, the claimant remarked, "she thought her neuropathy was slightly improved at a 'mild' level as she noticed that when she missed a dose of Cymbalta her numb[ness] and tingling were worse.["] (Exhibits C11F17-18)

* * *

I considered the opinions the State Agency medical consultants made at the initial and reconsideration determination levels. While I acknowledge these individuals have knowledge of the disability evaluation process and their findings are consistent with a finding of not disabled, I place no weight on the opinions because additional evidence has been submitted since their opportunity to review the record. The new evidence shows the claimant is limited to sedentary rather than light and medium exertional work with postural limitations given her ongoing numbness and tingling in the bilateral feet and hands that were present since her onset date. **I kept the limitations of frequent handling, fingering and feeling bilaterally, as she had strong handgrip during most examinations**. Thus, their assessment of the claimant's residual functional capacity is not consistent with the longitudinal evidence of record. (Exhibits ClA-C2A and C5A-C6)

Kristin Venables, Ph.D., a neuropsychologist opined on April 27, 2017, the claimant avoid multitasking and attempt to eliminate potential distractions from her environment when engaging in tasks that require concentration. Dr. Venables also opined the claimant's relatively global cognitive deficits would likely interfere with her ability to maintain competitive employment; however, she may have the cognitive ability to perform jobs similar to those she has held in the past. Dr. Venables opined the claimant should avoid jobs that are highly dependent on speed, abstract reasoning, planning, and math calculations. (Exhibit C9F68) I place weight on Dr. Venables opinion because it is consistent with the evidence of record, especially, both neuropsychological testing results.

(R. 21-24 (emphasis added).)

Plaintiff's argument that simply because the consultants did not have an opportunity to review the record post-dating their opinions, any reliance on their opinions by the ALJ would be erroneous or akin to "playing doctor," is unpersuasive.  "[A]n ALJ may embrace a state agency psychological consultant's opinion even if it was made before the record was fully developed."  *Kuikka v. Berryhill*, No. 17-cv-374 (HB), 2018 WL 1342482, at *10 (D. Minn. Mar. 15, 2018) (citation omitted).  "An ALJ may also assign significant weight to the opinion of a state agency medical consultant who did not have access to all of the records, so long as the ALJ conducts an independent review of the evidence and takes into account portions of the record the consultant had not considered."  *Id.* (citing *Perry v. Colvin*, No. 13-cv-1185 (JNE/TNL), 2014 WL 4113015, at *57-58 (D. Minn. Aug. 20, 2014)); *accord*, *Lilja v. Berryhill*, No. 16-cv-540 (TNL), 2017 WL 1183977, at *25 (D. Minn. Mar. 29, 2017) (citation omitted).

However, even though the burden of persuasion to prove disability and demonstrate RFC fall on Plaintiff as the claimant, an "ALJ bears a responsibility to develop the record fairly and fully, independent of the claimant's burden to press h[er] case."  *Vossen v. Astrue*, 612 F.3d 1011, 1016 (8th Cir. 2010) (citing *Snead v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004)) (citation omitted).  An ALJ is not required to seek additional information "unless a crucial issue is undeveloped.'"  *Id.* (emphasis in original) (quoting *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)) (citation omitted).  Therefore, an ALJ is only required to obtain additional information if the evidence in the record presented to the ALJ does not provide "sufficient medical evidence to determine whether the claimant is disabled."  *Halverson v. Astrue*, 600 F.3d 922, 933 (8th Cir.

2010) (marks omitted) (citing *Barrett v. Shalala*, 38 F.3d 1019, 1023 (8th Cir. 1994)).

Further, "reversal due to failure to develop the record is only warranted where such

failure is unfair or prejudicial." *Twyford v. Comm'r Soc. Sec.*, 929 F.3d 512, 517 n.3 (8th

Cir. 2019) (quoting *Shannon v. Chater*, 54 F.3d 484, 488 (8th Cir. 1995)).  Moreover,

while an ALJ need not address each and every piece of evidence presented to him, *see*

*Wildman v. Astrue*, 596 F.3d 959, 966 (8th Cir. 2010) (citation omitted)), the key

consideration is whether "on the aggregate" the ALJ's opinion, despite failing to

specifically address the evidence at issue, is supported by substantial evidence in the

record.  *Jacobson v. Astrue*, No. CIV. 12-984 PJS/JSM, 2013 WL 4586362, at *27 (D.

Minn. Aug. 28, 2013) (citing *Mortenson v. Astrue*, Civ. No. 10-4976 (JRT/JJG), 2011

WL 7478305 at *11 (D. Minn. Sept. 3, 2011), *R.&R. adopted by* 2012 WL 811510 (D.

Minn., Mar. 12, 2012)).

In this case, the ALJ in large part premised Plaintiff's ability to frequently engage

in handling, fingering, and feeling bilaterally based on the strength of her hand grip.  The

Commissioner's guidance in SSR 85-15 explicitly distinguishes between "handling

(seizing, **holding, grasping**, turning or otherwise working primarily with the whole hand

or hands)" and "Fingering," which "involves picking, pinching, or otherwise working

primarily with the fingers.  It is needed to perform most unskilled sedentary jobs and to

perform certain skilled and semiskilled jobs at all levels of exertion."  SSR 85-15

(emphases added).  Courts have cited to SSR 85-15 for the proposition that fingering is

synonymous with "fine manipulation" or "fine manual dexterity."  *See, e.g.*, *Delgadillo v.*

*Astrue*, No. CV 11-5998 AJW, 2012 WL 2005546, at *3 (C.D. Cal. June 4, 2012).

Moreover, SSR 85-15 provides that "[r]eaching, handling, fingering, and feeling require **progressively finer usage of the upper extremities** to perform work-related activities." *Id.* (emphasis added); *see also Grover v. Colvin*, No. 2:15-CV-204-JHR, 2016 WL 183645, at *4 (D. Me. Jan. 14, 2016) ("[W]hile the ruling does indicate that reaching and handling are in a category requiring less fine manual dexterity, it makes clear that both fingering and feeling are in a category requiring more."). In other words, while grip strength is important, it is not the only relevant factor and is not necessarily predictive or determinative of Plaintiff's ability to frequently engage in fine manual dexterity.

There is a concern, supported by the record, with respect to Plaintiff's ability to engage in fingering and fine usage of her upper extremities. As set forth above, the ALJ in his finding as part of the RFC concluded that throughout the medical record Plaintiff has complained of numbness and tingling in her hands, and that light touch elicited paresthesia and/or alloynia in her fingertips. Further, there is no dispute that the ALJ did not address the testing results by Dr. Venables showing that Plaintiff's fine motor speed was average with the right hand and severely impaired with the left hand (which appears to be her dominant hand) and that her manual dexterity was low average bilaterally. (R. 709.) In addition, there is no dispute regarding the ALJ's concern relating to the level at which Plaintiff could engage in handling, fingering, and feeling bilaterally, as is evidenced by his alternative hypothetical to the VE as to whether Plaintiff could perform work if she could only occasionally (as opposed to frequently) engage in such tasks, to which the VE responded that she could not perform the work. Indeed, the fact that the ALJ assigned Plaintiff with a sedentary RFC means a higher significance is placed on her

48

ability to engage in handling, fingering and feeling because, "[a]s a general rule, limitations of fine manual dexterity have greater adjudicative significance--in terms of relative numbers of jobs in which the function is required--as the person's exertional RFC decreases.  Thus, loss of fine manual dexterity narrows the sedentary and light ranges of work much more than it does the medium, heavy, and very heavy ranges of work."  SSR 85-15.  The Commissioner argues that the testing results are of no avail, as Dr. Venables did not translate these results into work limitations.  However, given the importance of handling, fingering, and feeling, and the concession that Plaintiff felt numbness in her hands, the Commissioner was obligated to develop the record further to determine what, if any, work limitations should be placed on Plaintiff's fingering and fine dexterity, as opposed to focusing primarily on grip strength.  As such, the Court remands this case back to the ALJ to determine the ability of Plaintiff, through the use of medical sources, to engage in fingering and fine dexterity at all levels based on the available medical record (including, but not limited, to Dr. Venables' test results) and issue a revised RFC and hypothetical to the VE only to the extent necessary.

**C.     Whether the Appeals Council Erred by Failing to Consider Evidence Submitted After the Hearing Before the ALJ**

With respect to the evidence submitted to the Appeals Council by Plaintiff after the hearing with the ALJ, the Appeals Council ruled in relevant part as follows:

> You submitted medical records from Hennepin Healthcare dated November 2, 2018 through January 16, 2019 (31 pages).  We find this evidence does not show a reasonable probability that it would change the outcome of the decision.  We did not exhibit this evidence.

> You submitted Hennepin Healthcare dated January 22, 2019 through May 22, 2019 (55 pages). The Administrative Law Judge decided your case through January 18, 2019. This additional evidence does not relate to the period at issue. Therefore, it does not affect the decision about whether you were disabled beginning on or before January 18, 2019.

(R. 2.)

Plaintiff argues documents submitted to the Appeals Council ranging in date from September 2018 through January 16, 2019 were generated before the ALJ's January 18 decision, and therefore should have been considered because they were new, not cumulative, and were material to the ALJ's decision. (Dkt. 22 at 30.) As to materiality, Plaintiff contends:

> [T]hese records are material to the ALJ's decision. In his opinion, the ALJ found [Plaintiff's] anxiety to be a nonsevere impairment "because it imposed no more than a minimal [sic] in the claimant's ability to perform work-related tasks." (R. 14.) The new records, which show [Plaintiff] was referred to a partial hospital program or day treatment that would have lasted six months[,] directly bear on and refute the ALJ's finding. [Plaintiff's] psychiatrist recommended these intensive programs for her personal recovery, and as [Plaintiff's] mental health conditions were affecting her daily living, they similarly would have affected her ability to work. Additionally, the records noting that her gait had worsened and that she was at a risk for falls directly impacts the ALJ's RFC finding that [Plaintiff] could perform sedentary work and "occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl." This information should have been considered because it directly impacts her physical abilities in the RFC determination.

(Dkt. 22 at 30.) The Commissioner argues that the Appeals Council weighed the new evidence for the relevant timeframe and found that it did not show a reasonable probability that it would change the outcome of the decision. (Dkt. 29 at 16.)

If the Appeals Council denies review without substantively considering newly submitted evidence, the reviewing court may remand the case where it relates to the

period on or before the date of the administrative law judge hearing decision.  20 C.F.R. § 404.970(b); *see also* 20 C.F.R. § 416.1470.  "The Appeals Council must consider evidence submitted with a request for review if it is '(a) new, (b) material, and (c) relates to the period on or before the date of the ALJ's decision.'"  *Bergmann v. Apfel*, 207 F.3d 1065, 1069 (8th Cir. 2000) (quoting *Box v. Shalala*, 52 F.3d 168, 171 (8th Cir. 1995)).  In order [t]o be 'new,' evidence must be more than merely cumulative of other evidence in the record."  *Id.*  "To be 'material,' the evidence must be relevant to claimant's condition for the time period for which benefits were denied.  Thus, to qualify as 'material,' the additional evidence must not merely detail after-acquired conditions or post-decision deterioration of a pre-existing condition."  *Id.* at 1069-70.  In addition, the Appeal Council will review a case based on new evidence if it meets the aforementioned requirements and "there is a reasonable probability that the additional evidence would change the outcome of the decision."  20 C.F.R. § 416.1470(a)(5); *see also Craig M. v. Berryhill*, No. 18-cv-908 (NEB/DTS), 2019 WL 2648029, at \*2 (D. Minn. June 10, 2019), *R.&R. adopted by* 2019 WL 2644199 (D. Minn. June 26, 2019).  However, when the Appeals Council denies review of an ALJ's decision after reviewing newly submitted evidence, a reviewing court does not evaluate the Appeals Council's decision to deny review but rather examines the record as a whole, including the additional evidence, to determine whether it supports the ALJ's decision.  *See McDade v. Astrue,* 720 F.3d 994, 1000 (8th Cir. 2013).

Exactly how the Appeals Council applied the regulations is somewhat unclear. The Appeals Council noted that "[w]e did not exhibit this evidence."  However, the

Appeals Council found that the additional evidence did not show a reasonable probability that the outcome of the ALJ's decision would change. (R. 2.) To make such a determination, the Appeals Council would, necessarily, have needed to consider the additional evidence. On this basis, the Court examines the record as a whole, including the additional evidence, to determine whether it supports the ALJ's decision.

The focus of the new documents is on the severity of Plaintiff's mental health impairments at Step Two of the analysis and her gait as it relates to the RFC with respect the sedentary level assigned, and whether she can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl.

At step two, the ALJ found that the "claimant's anxiety is a non-severe impairment because it imposed no more than a minimal in the claimant's ability to perform work-related tasks." (R. 14.) While the ALJ did not discuss Plaintiff's depression at step two, he did discuss Plaintiff's depressive symptoms as part of the RFC analysis. (R. 20.) At step two of the sequential analysis, the ALJ is required to determine whether a claimant's impairments are severe. *See* 20 C.F.R. § 404.1520(c). While "severity is not an onerous requirement for the claimant to meet . . . it is also not a toothless standard." *Wright v. Colvin*, 789 F.3d 847, 855 (8th Cir. 2015) (citations omitted). An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities. *See Bowen v. Yuckert*, 482 U.S. 137, 153 (1987). If the impairment would have no more than a minimal effect on the claimant's ability to work, then it does not satisfy the requirement of step two. *See Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir.

2007) (citations omitted).  Given that Dr. Floyd diagnosed Plaintiff with persistent depressive disorder; major depressive disorder and a generalized anxiety disorder, and it was recommended that she enter a partial hospitalization program or day treatment, the Court finds that, as part of the remand, the ALJ must consider the evidence submitted to the Appeals Counsel as part of his step two analysis to determine whether her anxiety and depression qualify as severe impairments and to continue the sequential analysis as needed.

However, the Court finds no basis to remand based on the additional records pertaining to Plaintiff's gait and balance.  Plaintiff ignores that although sedentary work may require some walking and standing, "a sedentary job is defined as one which involves sitting . . . ."  20 C.F.R. § 404.1567(a).  Moreover, while Plaintiff reported to Dr. Maiser that she needed to take frequent breaks while walking, as she felt off balance because of her neuropathy, and testing during PT showed she had an increased risk for falls, Plaintiff conceded that she did not use an assistive device to walk, she did not have any falls (and was also inconsistent around the relevant time period as to whether she had experienced near falls), and she reported being able to walk somewhat less than two blocks before needing a break.  (R. 55, 65-68, 72.)  This, coupled with a generally stable gait and no falls throughout the record, lead to this Court's finding that a remand on this issue is not warranted.

## V.    ORDER

Based on the above, and on the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.      Plaintiff DeAnna T.'s Motion for Summary Judgment (Dkt. 21) is **GRANTED** in part and **DENIED** in part;

2.      Defendant Commissioner of Social Security Andrew Saul's Motion for Summary Judgment (Dkt. 28) is **DENIED**; and

3.      This case be **REMANDED** to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g), for further administrative proceedings consistent with this Order.

   **LET JUDGMENT BE ENTERED ACCORDINGLY**


DATED: August 16, 2021                    *s/Elizabeth Cowan Wright*
                                           ELIZABETH COWAN WRIGHT
                                           United States Magistrate Judge